## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENVIRONMENTAL INTEGRITY PROJECT, FOOD & WATER WATCH, THE HUMANE SOCIETY OF THE UNITED STATES, CENTER FOR FOOD SAFETY, and IOWA CITIZENS FOR COMMUNITY IMPROVEMENT,<br><br>       Plaintiffs,<br><br>       v.<br><br>GINA MCCARTHY, Administrator, United States Environmental Protection Agency; and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>       Defendants. | Civil Action No. 13-1306 (RDM) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, five non-profit organizations,[1] challenge the decision of the Environmental

Protection Agency ("EPA" or "Agency") to withdraw a proposed rule that would have required

large industrial livestock operations to provide information to the EPA in order to facilitate the

EPA's ability to regulate their discharge of pollutants into the waters of the United States

pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*  Plaintiffs contend that the

EPA's decision to withdraw the proposed rule was arbitrary and capricious in violation of the

---

[1]  The plaintiffs are the Environmental Integrity Project ("EIP"), Dkt. 1 ¶ 12; the Food & Water Watch ("FWW"), *id.* ¶ 13; the Humane Society of the United States ("HSUS"), *id.* ¶ 14; the Center for Food Safety ("CFS"), *id.* ¶ 15; and Iowa Citizens for Community Improvement ("ICCI"), *id.* ¶ 16.

Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), because it lacks clear reasoning, runs counter to the evidence in the administrative record, and constitutes a clear error in judgment.  For the reasons set forth below, the Court concludes that the EPA's decision to withdraw the proposed rule did not violate the APA.  Accordingly, Plaintiffs' Motion for Summary Judgment, Dkt. 24, is **DENIED** and Defendants' Cross Motion for Summary Judgment, Dkt. 26, is **GRANTED**.

## I.  BACKGROUND

This case involves the EPA's efforts to gather information about Concentrated Animal Feeding Operations ("CAFOs")—industrial farm operations that are major sources of water pollution.  Although CAFOs have been regulated by the EPA for decades, the pollutants that they discharge—manure, litter, and process wastewater—remain a significant environmental and health problem.  As of 2003, the EPA estimated "that animals raised in confinement generate more than three times the amount of raw waste than the amount of waste that is generated by humans in the United States" and that "CAFOs collectively produce 60 percent of all manure generated by farms that confine animals."  *Nat'l Pollutant Discharge Elimination Sys. (NPDES) CAFO Reporting Rule*, 76 Fed. Reg. 65431, 65431 (Oct. 21, 2011).  According to Plaintiffs, "animal agriculture" in the United States generates "300 million tons of manure each year, and "[t]he vast majority of this waste eventually reaches the nation's waterways."  Dkt. 24-3 ¶ 11.  Among other things, pollutants from CAFOs can cause "harmful aquatic plant growth[s]" called "algal blooms," which "cause fish kills," "contribute to 'dead zones,'" and "often release toxins that are harmful to human life."  76 Fed. Reg. at 65432.  Moreover, "[m]ore than 40 diseases found in manure can be transferred to humans."  *Id.*  Runoff from manure also often includes

heavy metals, as well as antibiotics, growth hormones, and pharmaceutical agents administered

to livestock, which pose further threats to public health.  *Id.* at 65434**.**

Yet despite the substantial impact that CAFOs can have on the environment, the EPA

lacks a comprehensive understanding of the number, location, and permitting status of these

operations in the United States.  JA 155. [2]  As discussed further below, in 2011 the EPA

proposed two possible rules that would have required CAFOs to submit certain basic information

to the EPA, pursuant to the EPA's information-gathering authority under the CWA.  In the

proposed rulemaking, the EPA explained that the water contamination caused by CAFOs "may

be due, in part, to inadequate compliance with existing regulations or to the limitations in CAFO

permitting programs" and that "basic information about CAFOs would assist the Agency in

addressing those problems" and allow the Agency and others to "make more informed decisions"

about how to protect the environment.  76 Fed. Reg. at 65432.  After a notice and comment

period, however, the Agency decided not to adopt either rule and withdrew its proposed

rulemaking.  Plaintiffs challenge the EPA's decision to withdraw the proposed rules as arbitrary,

capricious, and contrary to law.

A.      **Statutory And Regulatory Background**

1.  ***The Clean Water Act***

The EPA proposed—and ultimately withdrew—the proposed rules at issue here pursuant

to its authority under the Clean Water Act.  The purpose of the CWA is to "restore and maintain

the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To

achieve that purpose, the CWA establishes several "national goal[s]," including the goals that the

---

[2]  The four-volume Joint Appendix is located at Dkts. 34 (pages i-313), 34-1 (pages 314-414),
34-2 (pages 415-524), and 40 (pages 525-557).  For ease of reference, the Court will cite to the
Joint Appendix page numbers.

"discharge of pollutants into the navigable waters be eliminated by 1985," *id.* § 1251(a)(1), that

"discharge of toxic pollutants in toxic amounts be prohibited," *id.* § 1251(a)(3), and that

"programs for the control of nonpoint sources of pollution be developed and implemented in an

expeditious manner so as to enable the goals of [the CWA] to be met through the control of both

point and nonpoint sources of pollution." *Id.* § 1251(a)(7).  The CWA provides that "the

discharge of any pollutant by any person shall be unlawful" unless that discharge is "in

compliance with" specified terms of the CWA.  33 U.S.C. § 1311.  The discharge of a pollutant

is defined to include "any addition of any pollutant to navigable waters from any point source."

*Id.* § 1362(12).  A point source, in turn, is defined as "any discernible, confined and discrete

conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete

fissure, container, rolling sock, *concentrated animal feeding operation*, or vessel or other floating

craft, from which pollutants are or may be discharged."  *Id.* § 1362(14) (emphasis added).

 EPA regulations define the facilities that qualify as "concentrated animal feeding

operations" subject to the rules governing point sources.  First, the regulations define "animal

feeding operations," or "AFOs," as facilities in which animals are contained for 45 days or more

in any twelve month period.  40 C.F.R. § 122.23(b)(1).  A "[c]oncentrated animal feeding

operation," or "CAFO," in turn, is any "animal feeding operation" that qualifies as either a

"Large CAFO" or a "Medium CAFO" or is designated a "significant contributor of pollutants to

waters of the United States."  *Id.* §§ 122.23(b)(2), (c).  Animal feeding operations are classified

as "Large" or "Medium" when they house specified minimum threshold quantities of animals;

for instance, to qualify as "large," an AFO must have at least 700 mature dairy cows or 55,000

turkeys, and to qualify as "medium," it must have between 200 and 699 mature dairy cows or

between 16,500 and 54,999 turkeys.  *See id.* §§ 122.23(b)(4), (6).  An AFO that does not meet

these numerical thresholds is considered a CAFO only if it is known significantly to contribute to water pollution.

The Clean Water Act provides for the regulation of point sources pursuant to the National Pollutant Discharge Elimination System ("NPDES"), 33 U.S.C. § 1342, which requires that any "point source" have a permit in order to "discharge" pollutants. The NPDES permitting requirement, accordingly, extends to all Large and Medium CAFOs that actually "discharge" and to those small CAFOs that significantly contribute to water pollution. In keeping with the CWA's recognition that states bear "the primary responsibilities and rights" to "prevent, reduce, and eliminate pollution," 33 U.S.C. § 1251(b), states, tribes, and territories may apply to administer their own NPDES programs. Presently, "[f]orty-six states and the U.S. Virgin Islands are authorized to administer the NPDES CAFO permitting program," and the EPA administers the program for the remaining four states. Dkt. 26-1 at 3.

A separate provision of the CWA—Section 308—provides the EPA with broad authority to gather information "[w]henever required to carry out the objective of" the Act. 33 U.S.C. § 1318(a). Specifically, Section 308 instructs the EPA, when "required to carry out the objectives of" the CWA, to "require the owner or operator of any point source to (i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment or methods . . . , (iv) sample such effluents . . . , and (v) provide such other information" as the Administrator "may reasonably require." *Id.* § 1318(a)(A). The EPA may exercise its Section 308 information-gathering authority either by promulgating a rule requiring point sources to submit information to the EPA or by surveying point sources without formal rule-making.[3] *See*

---

[3] If the Agency sends identical surveys to ten or more point sources, the survey qualifies as an "Individual Information Collection Request" under the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, and is subject to approval by the Office of Management and Budget.

*id.*; 77 Fed. Reg. at 42679.  The CWA also grants the EPA the right to enter any premise where effluent sources or relevant records are located, along with the right to access those records and sample effluents.  33 U.S.C. §§ 1318(a)(B)(i)-(ii).  The Act authorizes the EPA to impose penalties on entities that fail to provide information to the EPA under Section 308.  *See id.* § 1319.

## B.  Factual And Procedural Background

### 1.  *Prior Litigation:*  **Waterkeeper** *and* **NPPC**

In 2003, the EPA overhauled its regulations to "strengthen the existing regulatory program for CAFOs."  *NPDES Permit Regulation and Effluent Limitation Guidelines and Standards for CAFOs*, 68 Fed. Reg. 7,176 (Feb. 12, 2003).  Among other requirements, the 2003 rule established a "mandatory duty for all CAFOs to apply for an NPDES permit," *id.* at 7176, except for those CAFOs that "successfully demonstrated no potential to discharge," *id.* at 7182 (brackets omitted).  Both environmental and farm groups challenged the revised regulations, and in 2005 the United States Court of Appeals for the Second Circuit vacated and remanded the portion of the rule requiring that all CAFOs either "apply for NPDES permits or otherwise demonstrate that they have no potential to discharge."  *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 489, 504 (2d. Cir. 2005).  The court reasoned that the CWA authorizes the EPA to regulate "only the [actual] discharge of pollutants"—not "potential discharges"—and that the 2003 NPDES regulations exceeded the EPA's authority because they required even CAFOs that did not actually discharge pollutants to obtain permits.  *Id.* at 504, 524.

On remand, the EPA promulgated a new rule, which allowed CAFOs to avoid the permitting requirement by voluntarily certifying that they neither discharged nor "propose[d] to discharge" pollutants.  *Rev'd NPDES Permit Regulation and Effluent Limitations Guidelines for*

*CAFOs in Response to the Waterkeeper Decision*, 73 Fed. Reg. 70418, 70426 (Nov. 20, 2008).

Once again, both environmental groups and farm groups challenged the rule, and once again, the

rule was vacated to the extent that it required permits for CAFOs that do not actually discharge.

*Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 756-57 (5th Cir. 2011) (vacating

requirement that CAFOs that *propose* to discharge must apply for permit) ("*NPPC*").

      The environmental groups raised separate claims in the *NPPC* case, which were severed

and resolved in a settlement agreement.  As part of that settlement agreement, the EPA

"committed to propose a rule, pursuant to CWA section 308, that would require CAFOs to

provide certain information to EPA." 76 Fed. Reg. at 65435.  The settlement agreement further

specified that the EPA's proposed rule would either require all CAFOs (regardless of whether

they discharge or have an NPDES permit) to submit fourteen specific pieces of information,[4] or,

if the EPA decided not to include this requirement, it would explain its reasons for the exclusion.

Under the settlement agreement, the EPA was required to take final action on the proposed rule

by July 13, 2012.  The EPA did not, however, commit to adopting the rule or to undertaking any

specific course of action; to the contrary, consistent with the APA, the settlement agreement

expressly provided that it did not limit the EPA's ultimate rule-making discretion.  *Id.*

---

[4]  The fourteen pieces of information included (1) name and address of the owner and operator;
(2) if contract operation, name and address of the integrator; (3) location (longitude and latitude)
of the operation; (4) type of facility; (5) number and type(s) of animals; (6) type and capacity of
manure storage; (7) quantity of manure, process wastewater, and litter generated annually; (8)
whether the CAFO land-applies; (9) available acreage for land application; (10) if the CAFO
land-applies, whether it implements a nutrient management plan for land application; (11) if the
CAFO land-applies, whether it employs nutrient management practices and keeps records on
site; (12) if the CAFO does not land-apply, alternative uses of manure, litter, and/or wastewater;
(13) whether the CAFO transfers manure off site, and if so, quantity transferred to recipient(s) of
transferred manure; and (14) whether the CAFO has applied for an NPDES permit.  76 Fed. Reg.
at 65435.

2.  *The October 2011 Proposed Rule*

Pursuant to the *NPPC* settlement agreement, in October 2011 the EPA "co-proposed"

two possible rules that would require CAFOs to submit five of the fourteen pieces of information

addressed in the settlement agreement.  The EPA's Federal Register notice explained that the

purpose of the proposed rule was to "improve and restore water quality by collecting facility-

specific information that would improve EPA's ability to effectively implement the NPDES

program and to ensure that CAFOs are complying with the requirements of the CWA," including

the NPDES permit requirements.  76 Fed. Reg. at 65436.  The EPA further explained that facility

location and basic operational characteristics "is essential information needed to carry out

NPDES programmatic functions" and that principal NPDES functions "can be carried out most

efficiently and effectively when EPA and states have access to facility contacts and other

information about CAFOs."  *Id.*  The rules were proposed pursuant to the EPA's Section 308

information-gathering authority, which, in the EPA's view, is broader than the permitting

authority at issue in *NPPC* and *Waterkeepers*.[5]  The proposed rules, accordingly, extend to all

CAFOs, including those that do not actually "discharge."

Under the first "co-proposed" rule (the "Information Rule"), all CAFOs would be

required to submit to the EPA five of the fourteen pieces of information discussed in the

---

[5]  Section 308 authorizes "information collection from 'point sources,'" which are defined to include "CAFOs that discharge or *may* discharge."  76 Fed. Reg. at 65436 (citing 33 U.S.C. §§ 1318(a), 1362(14) (emphasis added)).  The EPA explained that although the Fifth Circuit held that "EPA's authority is limited to CAFOs that discharge," that ruling was "limited to the specific type of regulation at issue before the court: the duty to apply for a permit."  *Id.*  The proposed rule, in contrast, "proposes options for gathering basic information from CAFOs."  As the EPA explained, "the plain language of section 308 expressly authorizes" such information collection.  *Id.*  The parties here do not dispute that the Information Rule would have constituted a proper exercise of the EPA's authority.

settlement agreement:  CAFOs' "contact information, location of the CAFO's production area, NPDES permitting status, number, and type of animals, and number of acres available for land application."  *Id*.  Under the second "co-proposed" rule (the "Focused Rule"), rather than requiring all CAFOs to submit information, the EPA would identify "focus watersheds where CAFO discharges may be causing water quality concerns," then make "every reasonable effort" to determine whether sufficient information about the CAFOs in each "focus watershed" was available.  If not, the EPA would "use its section 308 authority to obtain information from CAFOs in those areas."  *Id*.  After working with "partners at the Federal, state, and local level" to determine whether CAFOs should be required to respond to a survey request, the EPA would issue a "locally-applicable notice in the Federal Register" and undertake local outreach efforts to CAFOs in the watershed.  *Id*.

     In addition to the two "co-proposed" rules, the EPA set forth three other possible "alternative approaches" and solicited comments on whether the EPA "should explore" those alternatives.  *Id*. at 65437.  The three alternatives included "(1) [a]n approach that would obtain data from existing data sources, (2) an approach that would expand EPA's network of compliance assistance and outreach tools and (3) an approach requiring NPDES authorized states to submit the information…to EPA."  *Id*. at 65445.  The first of these three alternatives— obtaining information from existing sources (the "existing information approach")—bears focus because it closely approximates the approach the EPA ultimately took in its final agency action.

     Under the "existing information approach," the EPA would seek to leverage "available existing sources of data" to further its statutory aims, rather than requiring CAFOs to submit that information to the EPA.  *Id*.  The EPA listed a number of known sources of information about CAFOs, "identifie[d] some of the limitations EPA faces" in using each source, and solicited

comment "on ways in which EPA could leverage these sources collectively to address impacts from CAFOs." *Id*. The EPA specifically discussed the following possible data sources:

- U.S. Department of Agriculture ("USDA"): The EPA explained that the USDA is a "leading source" of agricultural data, but federal law prohibits the USDA from disclosing data unless it has been converted into an aggregate form that "does not allow the identification of the person who supplied information." *See* 7 U.S.C. § 2276(a). At the time the proposed rule was promulgated, the EPA accordingly used publicly available aggregate data from the USDA to estimate details about the CAFO universe, but could not obtain from the USDA facility-specific data. 76 Fed. Reg. at 65445.

- State NPDES Permitting Programs: The EPA explained that states that issue NPDES permits should have all of the data requested for at least those CAFOs that are permitted. Not all of the states, however, have that information in electronic form, and some states may not have data that is "complete or readily available." *Id*. A further difficulty is that states do not gather data "based on a national standardized reporting scheme," leading to inconsistencies that could "prevent EPA from compiling a consistent summary of CAFO information." *Id*. at 65445-46. Accordingly, the EPA explained that "a national inventory based solely on state data would not be comprehensive." *Id*. at 65446.

- State Registration or Licensing Programs: The EPA explained that "[m]any state agriculture departments have registration or licensing programs that collect information from livestock farms separately from environmental permitting requirements." *Id*. This information, however, is generally limited to contact information. *Id*. The EPA sought comments as to "the availability" of such lists and "whether information obtained from such programs could be shared with EPA." *Id*.

- Satellite Imagery and Aerial Photographs: The EPA explained that satellite imagery and aerial photography can be used to "locate and map CAFOs" by identifying visible structures associated with CAFOs. These techniques, however, cannot determine whether structures "actually contained animals, whether an operation met the regulatory definition of a CAFO or had NPDES permit coverage," and is thus "most useful" when supplemented by "on-the-ground efforts to confirm site-specific information." *Id*.

- Reporting Requirements Under Other Programs: The EPA noted that it was "in the process of developing a rulemaking" that would change reporting requirements for livestock operations on air emissions, and it solicited comments on whether the Agency could obtain information to meet its CWA needs through that rulemaking process. *Id*. at 65446-47.

- Other Sources of Data:  Finally, the EPA noted that it might be possible to gather some information from nongovernmental entities' reports, conservation programs, and extension agents.  The EPA noted, however, that "[i]n general, these sources only release aggregated data and may not specifically focus on operations that meet EPA's definition of a CAFO."  *Id.* at 65447.

The EPA explained that if it adopted the "existing information approach," it would "combine a variety of data sources to determine where CAFOs are located and overlay this information with existing data on impaired waterbodies to determine" where to focus its regulatory activities.  *Id*. It acknowledged, however, that existing data sources are "not consistent and are not comprehensive nationwide," and it therefore sought comments on how these and other sources could "be used collectively to protect water quality from CAFO discharges" without requiring all CAFOs to submit information to the EPA.  *Id.*

The EPA received 1,403 comments in response to its notice of proposed rulemaking.  *See Nat'l Pollutant Discharge Elimination System (NPDES) Concentrated Animal Feeding Operation (CAFO) Reporting Rule Withdrawal*, 77 Fed. Reg. 42679, 42679 (July 20, 2012). Industry groups were uniformly opposed to any rule, and argued, among other things, that the Information Rule would be unduly burdensome, would require CAFOs to submit information that state agencies already had, and, by making location-specific information public, would compromise the security of CAFOs and their operators.  *See, e.g.*, JA 417, 425, 431, 434, 445, 470, 552.  Those who opposed the proposal characterized the process as "rule development by settlement agreement," *e.g.* JA 443, JA 354, and argued that under the *Waterkeeper* and *NCCP* decisions, the EPA lacked authority to impose a reporting requirement on CAFOs that do not "discharge," *see, e.g.*, JA 548-49, 550, 553, 556.  Environmental groups, in contrast, generally supported the Information Rule, but argued that it did not go far enough; they explained that proper implementation of the CWA requires the EPA to have even more information than it

sought.  Finally, "[s]tate and state association commenters questioned the need for new

regulations in light of states already having the information the EPA was seeking by virtue of

existing CAFO programs at the state and local level."  77 Fed. Reg. at 42681; *see also, e.g.*, JA

443 (comments from the Association of Clean Water Administrators) ("Most states do not

believe this rule as proposed will benefit their programs and in fact believe this rule will divert

resources away from CAFO/AFO permitting, inspections, compliance assistance, and

enforcement.").

### 3.   *The 2012 Withdrawal Of The Co-Proposed Rules*

On July 20, 2012, the EPA took final action on the October 2011 proposed rule.  Rather

than implementing either of the two "co-proposed" rules, it withdrew its proposal to collect

CAFO information by rule, explaining that "[i]nstead, the EPA, where appropriate, will collect

CAFO information using existing sources of information, including state NPDES programs,

other regulations, and other programs at the federal, state, and local levels."  77 Fed. Reg. at

42679.  The EPA concluded that "at this time, it is more appropriate to obtain CAFO information

by working with federal, state, and local partners instead of requiring CAFO information to be

submitted pursuant to a rule."  *Id.*

In explaining its decision, the EPA noted that it had considered additional information

and conducted a more detailed review of available data since proposing the Information Rule in

2011.  *Id*.  In particular, after the proposed rule was promulgated, the EPA "conducted a

preliminary evaluation" of the information available on the internet from 37 state permitting

authorities, which yielded information on 7,473 "operations that confine animals," including

both CAFOs and operations that do not meet the federal definition of a CAFO but are required to

have permits under state law.  *Id*.  In the interim, the EPA also entered into a Memorandum of

Understanding ("MOU") with the Association of Clean Water Administrators ("ACWA")—an "independent, nonpartisan, non-profit corporation of state and interstate water program managers"—which agreed to assist the EPA in collecting information about CAFOs.  *Id.*  In the Agency's view, "working through existing partnerships will yield timely and useful results in obtaining much of the needed CAFO information."  *Id.*

The EPA also concluded that it could "obtain much of the desired CAFO information from federal agencies, states, and other existing data sources."  *Id.*  More specifically, it explained that states that issue NPDES permits already have basic information from NPDES-authorized CAFOs and that those states are required to allow the EPA to review their records involving those CAFOs.  *Id.* at 42682.  As the Agency explained, states have "longstanding relationships with owners and operators of operations that confine animals," which will "facilitate information sharing."  *Id.* at 42681.  The EPA also noted that its relationships with USDA, U.S. Geological Survey, and "other federal partners" would aid in its data collection efforts.  *Id.*  Finally, the EPA added that it could also use "existing tools, such as site visits and individual information collection requests" to fill information gaps.  *Id*. at 42682.

The EPA emphasized that withdrawing the rule would not preclude it from proposing a similar rule in the future, if necessary.  The efforts it planned to undertake without rulemaking were intended to ascertain what rulemaking, if any, was necessary.  *Id.* ("[C]ollecting existing information, evaluating it, and compiling it in one format will better inform the Agency of what additional information may be needed and the best way to collect that information, if necessary.").  The EPA simply concluded that—"at this time"—working with the Department of Agriculture, the states, and others would be "an effective approach to obtaining CAFO information that will minimize the burden on states and CAFOs."  *Id*.

Shortly after withdrawing the proposed rules, the EPA issued "Supplemental Responses to Comments," JA 33-39, in which it elaborated on its rationale for withdrawing the proposed rules. It emphasized that it was still committed to gathering information from CAFOs and that CAFOs remain "an enforcement priority for the EPA." JA 35. Moreover, it acknowledged that "obtaining CAFO information from existing sources may not produce a comprehensive inventory of CAFO information," JA 36, but explained that doing so is an "important next step" and that a separate, concurrent rulemaking (the "E-Reporting Rule") would "pave the way" for a national inventory of permitted CAFOs. *Id.* The EPA agreed with the environmental group commenters that the greatest benefit from the proposed rules "might be derived from collecting data from unpermitted CAFOs," but noted that such CAFOs "may be less likely to comply with the proposed rule either because they are unaware of the requirement or because they do not understand that the requirement applies to them." JA 37. Finally, the Agency emphasized that because it "is not promulgating a rule, it can employ resources that would have been spent on implementation of the rule to reviewing existing sources of information and focus resources on identifying CAFOs that do not have NPDES permit coverage." JA 37.

## II. ANALYSIS

### A. Standing

Although Defendants do not contest Plaintiffs' standing, the Court must "satisfy itself of its authority to hear the case." *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C. Cir. 1984). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As is often repeated, the "irreducible constitutional minimum" of standing has three elements: (1) "the plaintiff must have suffered an injury in fact"; (2) there must be a "causal connection" between the injury and the challenged

conduct; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Lujan*, 514 U.S. at 560 (internal citations omitted).  Organizations like the Plaintiffs can establish standing either on their own behalves ("organizational standing") or on behalf of their members ("associational standing").  To establish associational standing, an organization must demonstrate that "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (citation omitted); *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  So long as at least one plaintiff has standing and the remaining conditions are satisfied, the Court may hear the case.  *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

The EPA concedes that at least two of Plaintiffs—ICCI and FWW—have demonstrated that they meet the requirements of associational standing.  Specifically, the EPA concedes that ICCI and FWW members have demonstrated a "concrete interest in using the CAFO information that would have been collected under the Proposed Rule to improve their recreational enjoyment of waterways," that they suffered "an injury as the result of the withdrawal of the proposed rule," and that the injury "is 'fairly traceable' to EPA's actions" and "could be 'redressed by a favorable decision.'"  Dkt. 47 at 3.  The Court agrees with the parties that, at minimum, ICCI and FWW have standing.

In limited circumstances, denial of access to information to which a plaintiff is entitled can constitute an "injury in fact" for purposes of standing.  *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998).  A plaintiff claiming informational standing must "'(1) identify a statute that, on plaintiff's reading, directly requires the defendant to disclose information that the

plaintiff has a right to obtain, (2) show that [plaintiff] has been denied the information to which [plaintiff] is entitled, and (3) provide a credible claim that the information would be helpful to [plaintiff].'" *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 197 (D.D.C. 2015) (quoting *WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 92 (D.D.C. 2012) (alterations in original)). Here, Plaintiffs challenge the EPA's decision to withdraw the proposed Information Rule, which it had proposed pursuant to its information-gathering authority under Section 308 of the CWA, 33 U.S.C. § 1318. Section 308 contains a public disclosure provision that expressly requires that "any records, reports, or information obtained under [Section 308] . . . shall be available to the public," unless the information would reveal trade secrets. *Id.* Plaintiffs' claim for relief, moreover, distills to an argument that the EPA was required to use its Section 308 authority to gather information on CAFOs, and, for standing purposes at this stage in the litigation, the Court must assume that Plaintiffs will prevail on the merits. *See City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). If Plaintiffs are correct and any final action on the EPA's proposed rule consistent with the APA would have required the EPA to obtain the CAFO information that Plaintiffs seek, Plaintiffs—and their individual members—would be legally entitled to that information. The Court thus concludes that even though Plaintiffs seek information that is not currently in the possession of the EPA, they would be entitled to the sought-after information if they were to prevail on the merits, and they accordingly meet the first two requirements for informational standing.

As for the third requirement—that the information would be helpful to the plaintiff—the declarations of individual members submitted by ICCI and FWW demonstrate that the EPA's failure to collect and to disclose information regarding CAFOs has materially damaged their recreational interests. ICCI member Rosemary Partridge believes that CAFOs have caused the

water quality in the creek on her property to decline.  Dkt. 24-5.  While she "used to wade and recreate in and around" the creek, she "no longer does so due to [her] concern that CAFO pollution has made the creek unsafe," and she no longer allows her grandchildren to play in the creek.  *Id.* ¶ 11.  In the absence of an EPA database, she has undertaken efforts to collect information regarding nearby CAFOs herself.  She explains that the "EPA's failure to finalize its rule . . . has made it necessary for [her] to drive throughout [her] county to track CAFO construction, monitor pollution in [her] nearby waterways, and refrain from using waterways [she] formerly used and enjoyed," because she does not have "access to the information [she] need[s] to make informed decisions about recreating in local waterways."  *Id.* ¶ 18; *see also* Dkt. 24-4 ¶ 21 (noting that absent the rule, ICCI members "cannot make informed decisions about where to safely swim or fish, cannot establish why a waterway near them may be polluted, and bear the burden of identifying polluting facilities that have not been adequately regulated by IDNR.").  FWW member Kathlyn Phillips, who serves as a "coastkeeper" for the Assateague Coastal Trust, similarly explains that her concern regarding pollution from CAFOs makes it "much less enjoyable" when she recreates on local rivers or kayaks in her capacity as coastkeeper, Dkt. 24-8 ¶ 20, and that her lack of access to information about nearby CAFOs "heighten[s] her fear and concerns, and decrease[s her] enjoyment of" local waterways.  *Id.* ¶ 21.

ICCI and FWW, accordingly, have established that at least one member of each association has Article III standing.  In addition, the interests that ICCI and FWW seek to protect through this lawsuit are "germane to [their] purpose[s]," and, given the nature of the relief sought, there is no need for the individual members to participate in the lawsuit.  *See Nat'l Ass'n of Home Builders*, 667 F.3d at 12.  The Court thus concludes that, at minimum, FWW and ICCI

have associational standing to pursue this action.[6]  *See also American Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 542 & n.1 (6th Cir. 2004).

The Court also concludes that Plaintiffs have demonstrated organizational standing.  To establish organizational standing, a plaintiff must show more than a mere "setback to [the] organization's social interests," *Havens Realty Corp.  v. Coleman*, 455 U.S. 363, 379 (1982), a "self-inflicted budgetary choice,'" *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011), or an effect on the "organization's lobbying activities," *Americans for Safe Access v. DEA*, 706 F.3d 438, 457 (D.C. Cir. 2013).  Subject to these limitations, however, a "concrete and demonstrable injury to [the] organization's activities—with the consequent drain on the organization's resources"—can, at least at times, support an assertion of organizational standing.  *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture*, __F.3d__, 2015 WL 4727327, *5 (D.C. Cir. Aug. 11, 2015).  Of particular relevance here, moreover, the Court of Appeals held just last month that when one of an organization's core activities involves "educating the public" about a particular issue, *id.* at

---

[6]  The Supreme Court has recently made clear that the "zone of interest" and "causation" tests previously characterized as "prudential standing" do not go to subject matter jurisdiction, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389, nn. 4, 6 (2014), but rather to the distinct question of whether a party has a valid cause of action.  A statutory cause of action generally "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 1388.  In the context of APA claims, this test is "not especially demanding"; in such cases, the Supreme Court has "often conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff, and ha[s] said that the test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* at 1389 (quotation marks omitted).  Here, Plaintiffs' injuries are related to water pollution and are within the zone of interest covered by the statute, and Defendants do not dispute that the injuries are at least in part proximately caused by the EPA's decision to withdraw the proposed rule. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1315-16 (D.C. Cir. 2015).

*5, an agency action that "deni[ed] [the organization] access" to important information relevant to that mission, and thus caused the organization to "expend resources to counter" that loss, can give rise to "a cognizable injury sufficient to support standing," *id.* at *6.

That holding is on all fours with Plaintiffs' assertion of organizational standing.  Plaintiff FWW, for instance, has built and maintains its own mapping inventory of CAFOs in the United States, "largely because the EPA does not provide this information to the public itself," and it expends significant resources to collect that information.  Dkt. 48 at 18; Dkts. 48-4 ¶ 21.  Plaintiffs CFC and HSUS similarly explain that in the absence of federal information, they expend their "own resources to collect and distribute" information on CAFOs as part of the educational and advocacy efforts are central to their missions.  Dkt. 48-5 ¶ 17 (CFS); Dkt. 48-6 ¶¶ 13-14 (HSUS).

The Court is thus satisfied that it has jurisdiction and thus proceeds to the merits.

## B.  Review Under the Administrative Procedure Act

This is neither a garden variety APA challenge to an agency action, subject to the usual standards of review, nor a challenge to an agency's refusal to initiate a rulemaking, subject to an "extremely limited and highly deferential standard" of review, *Massachusetts v. EPA*, 549 U.S. at 527-28 (quotation marks omitted).  Plaintiffs' claim, rather, falls between these extremes; it is not a challenge to a "mere failure to act," *Williams Nat'l Gas Co. v. FERC*, 872 F.2d 438, 443 (D.C. Cir. 1989), but to the EPA's decision to withdraw a proposed rule.  As the Court of Appeals has recognized, the withdrawal of a proposed rule after a notice and comment period is subject to judicial review under the APA.  *Id.*  That review, however, requires even greater deference than is accorded a "decision to promulgate a new rule or to rescind an existing one." *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 43 (D.C. Cir.

2004).  This more deferential review is warranted because a decision that "alters the regulatory status quo" requires "more persuasive justification than does the decision to retain an existing rule."  *Williams Nat. Gas Co.*, 872 F.2d at 443.  Similarly, the court's analysis must also be guided by appropriate deference to an agency's discretion to set the "timing and priorities of its regulatory agenda."  *WildEarth Guardians v. EPA*, 751 F.3d 649, 651 (D.C. Cir. 2014); *see also Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983) ("[A]n agency's control over the timetable of a rulemaking proceeding is entitled to considerable deference.").

Although entitled to this enhanced deference, the decision to withdraw a proposed rule is subject to the same underlying requirement of "reasoned decisionmaking," *see Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (quotation marks omitted), that generally applies, *Williams Nat. Gas Co.*, 872 F.2d at 444. Thus, an agency's decision to withdraw a proposed rule must be set aside if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins Co.*, 463 U.S. 29, 43 (1983).  An agency may decide not to proceed with a proposed rule, *see Neighborhood Assistance Corp. v. Consumer Fin. Prot. Bureau*, 907 F. Supp. 2d 112, 124 (D.C. Cir. 2012), but it may not withdraw a proposal for "no reason whatsoever."  *Int'l Union*, 358 F.3d at 44 (quotation marks and citation omitted).

Here, Plaintiffs cast most of their arguments under a single rubric—the Supreme Court's admonition in *State Farm* that "normally, an agency rule would be arbitrary and capricious if the agency . . . offered an explanation for its decision that runs counter to the evidence before the

agency." *See* Dkt. 35 at 2 (Table of Contents); *id.* at 17.  This principle, however, implicates

different considerations in different contexts.  To the extent Plaintiffs challenge the clarity of the

explanation offered by the EPA, the relevant inquiry is whether the Agency's decision is

"adequately explained" and "coheren[t]," *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)

(citations and quotation marks omitted), and whether the Agency's "path may reasonably be

discerned,'" *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight

Sys.*, 419 U.S. 281, 286 (1974)).  And, to the extent Plaintiffs challenge the EPA's assessment of

the record that was before it, the Court must consider that record, but must also defer to the EPA

and avoid "substitut[ing] its judgment for that of the [A]gency."  *Id.*

    **1.** *Was the EPA's Decision Adequately Explained?*

    As an initial matter, the Court concludes that the EPA's notice withdrawing the proposed

rule and supplemental response to comments are "adequately explained" and "coherent."

Mirroring the "existing information approach" set forth in the notice of proposed rulemaking, the

EPA concluded that it would attempt to rely on existing sources of information before deciding

whether—and, if so, how—to impose mandatory reporting requirements.  It recognized that this

approach would not yield a comprehensive database, but would allow it to "obtain much of the

desired CAFO information."  77 Fed. Reg. at 42681.  It would also allow the EPA to assess

"what additional information may be needed and the best way to collect that information, if

necessary."  *Id.* at 42682.  And, it concluded that by "not promulgating a rule," it would be able

to allocate its resources "to reviewing existing sources of information and . . . [to] identifying

CAFOs that do not have NPDES permit coverage."  JA 37.  In the words of the EPA, "[l]imited

Agency resources warrant a targeted approach that will result in the greatest impact on water

quality."  *Id.*

In particular, the EPA recognized certain comparative advantages of the "existing information approach." Most notably, it was optimistic that "working through existing partnerships" with the states and other federal agencies would "yield timely and useful results," particularly given the states' "longstanding relationships with owners and operators of operations that confine animals." 77 Fed. Reg. 42681. Indeed, "[s]ome states" submitted comments indicating that "they have the information proposed to be collected by the rule and expressed interest in working with the EPA to exchange that information." *Id*. In states where CAFOs are permitted at the state level, the states should have "basic information" relating to those entities; where CAFOs are permitted at the federal level, the EPA should already have necessary information; and where CAFOs are not permitted, the EPA recognized that additional information would be needed and that "other state programs, such as state operating permits," might help fill the gap. *Id.* at 42682. The EPA also stressed that it had recently entered into an MOU with the ACWA "that specifically will assist the Agency in collecting information about CAFOs." *Id.* at 42681.

Although recognizing that the existing information approach "may not produce a comprehensive inventory of CAFO information," JA 36, the EPA further explained that the proposed Information Rule posed its own difficulties and that, "[r]egardless of the EPA's approach to collecting CAFO information, data accuracy and reliability [would be] an issue," JA 38. Most notably, the EPA agreed "with environmental groups that the greatest benefit from the proposed rule might be derived from collecting data from unpermitted CAFOs." JA 37. But it was far from clear that these unpermitted CAFOs would uniformly respond to a mandatory reporting requirement. As the EPA explained, and as "state commenters pointed out," "CAFOs without NPDES permit coverage may be less likely to comply with the proposed rule either

because they are unaware of the requirement or because they do not understand that the requirement applies to them." *Id.* A "lack of [i]nternet access in many rural areas where many CAFOs are located could" also "result in a failure to respond" to CAFO surveys. JA 38. Accordingly, the EPA explained, even if it had adopted the proposed Information Rule, that would "not mean that reported data [would have been] complete or accurate." *Id.*

This explanation of the EPA's decision is sufficient. One might disagree with the Agency's conclusions or analysis—as Plaintiffs do—but its explanation is plain and coherent: Although not perfect, existing sources may yield "much" of the information that the Agency needs. Other approaches, including the proposed Information Rule, are also not perfect, and may divert Agency resources. So, at least for now, the EPA believes that it is sensible further to explore, to develop, and to assess existing sources, while maintaining the option of adopting a mandatory reporting requirement or other approach based on what the Agency learns from its current efforts.

Plaintiffs nonetheless contend that the EPA's explanation is inadequate because it failed to specify the "quantity and quality of available existing information" that it will be able to compile if the Information Rule is not adopted. Dkt. 24-1 at 24. In particular, they argue that the Agency's use of general phrases—such as its statement that it believes it can acquire "*much* of the needed CAFO information" without the proposed rule—constitute "blatant obfuscation" that "makes judicial review of the connection between the facts found and the conclusions drawn essentially impossible." *Id.* (describing withdrawal notice as "conclusory" and "cursory," in violation of the APA's requirement of "reasoned decision making."); *see also* Dkt. 31 at 6 ("[t]he meager attempt at . . . an explanation in the Withdrawal Notice is so hazy and vague it makes judicial review an impossible shell game.").

That argument fails to confront the EPA's stated rationale.  The fact that the Agency has not reached conclusions regarding the "quantity or quality" of existing data is just the point.  One of the goals of the proposed course of action is to "better inform the Agency of what additional information may be needed" before it takes any mandatory action.  77 Fed. Reg. at 42682.  There is no basis, moreover, to conclude—as Plaintiffs suggest—that the EPA already knows the answer to this question and is merely "obfuscating" to avoid effective judicial review.  The Court, accordingly, concludes that the EPA has adequately explained the basis for its decision to withdraw the proposed rule.

### 2. *Was The EPA's Decision Supported By The Administrative Record?*

Plaintiffs' more substantive challenges posit that the Agency erred in concluding that it could effectively and efficiently gather the information necessary to regulate CAFOs without adopting the Information Rule.  *See* Dkt. 24-1 at 23-34.  As the Court of Appeals has observed, "[w]hen the arbitrary or capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test." *Assoc. of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Bd.*, 745 F.2d 677, 683-84 (D.C. Cir. 1984) (emphasis omitted). This is because "it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense." *Id.* at 684.  Under the substantial evidence test, a court asks whether a "reasonable mind might accept a particular evidentiary record as adequate to support a conclusion." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (quotation marks omitted); *see also, e.g.*, *Verizon v. FCC*, 740 F.3d 623, 643-44 (D.C. Cir. 2014).

a. *Existing Sources of Information*

24

Plaintiffs first argue that that the EPA's "belie[f] that it can obtain much of the desired CAFO information from federal agencies, states and other existing sources," 77 Fed. Reg. at 42681, is "unsupported by the administrative record," Dkt. 24-1 at 23.  This contention requires separate consideration for (1) CAFOs that are permitted, and (2) CAFOs that are not permitted, either because they should be permitted but are not or because no permit is required.

Permitted CAFOs.  The EPA's regulations already provide that any application for a CAFO permit must list the CAFO's owner or operator, location, number and type of animals, and the number of acres available for land application of manure, litter, or process waste water. 40 C.F.R. §§ 122.21(i), 122.23(d).  This is essentially the same information that the EPA proposed to obtain from CAFOs under the proposed Information Rule.  76 Fed. Reg. at 65436-37.  According to the EPA, "[f]orty-six states and the U.S. Virgin Islands are authorized to administer the NPDES CAFO permitting program," and the EPA administers the program for the remaining four states. [7]  Dkt. 26-1 at 8.  With respect to the states where the EPA administers the NPDES program, the EPA already has the relevant information for CAFOs with NPDES permits.  77 Fed. Reg. at 42681.

With respect to the remaining states, the issue is more complicated.  As the EPA noted in its notice of proposed rulemaking, "[a]uthorized states have information from permit applications and annual reports for CAFOs with permit coverage."  76 Fed. Reg. at 65431, 65445.  Some

---

[7]  Although the EPA states in its briefs—without citation—that 46 states "are authorized" to administer the NPDES CAFO permitting programming, Dkt. 26-1 at 8, it is not entirely clear how many states were authorized to administer the NPDES program with respect to CAFOs at the time of the final rulemaking in 2012.  In the final rulemaking, the EPA explained that "although, at present [as of 2012], there are 47 states authorized to implement the NPDES program, a number of those states either have no CAFOs or are not authorized to implement the CAFO portion of the NPDES program.  In states where the EPA administers the NPDES program for CAFOs, the EPA has information for CAFOs with NPDES permit coverage from permit applications or notices of intent."  77 Fed. Reg. at 42681.

significant limitations, however, exist.  Notably, "not all states have made this information electronically accessible," and, in some cases, the paper records "may not be complete or readily available."  *Id.*  In addition, the EPA initially concluded that "[r]eporting inconsistencies across jurisdictions would prevent EPA from compiling a consistent national summary of CAFO information."  *Id.* at 65446.  Yet, in deciding to rely on existing sources of information, the EPA observed that "[s]tates are required to allow the EPA to routinely review state records, reports, and files relevant to" the NPDES program, and it expressed its belief that "at this time, NPDES authorized states have basic information from the permit application for at least those CAFOs with NPDES permit coverage."  34 Fed. Reg. at 42682 (citing 40 CFR §§ 123.41, 123.43).  And, the Agency concluded that it believes that the NPDES authorized states "will share that information with the EPA."  *Id.*

Plaintiffs point to evidence that "[s]ome states do not provide latitude/longitude coordinates—only address, city, county and/or section, township and range," that "[s]ome states . . . do not have animal type/number or other information to enable determination of whether the facilities meet the federal CAFO definitions," that some states issue permits covering multiple facilities, and that other gaps may exist.  JA 239; *see also* JA 124.  Neither that evidence nor anything else that Plaintiffs have identified, however, shows that the EPA's conclusion that "it can obtain *much* of the desired CAFO information from" existing sources is not supported by substantial evidence.  As indicated in the EPA's notice withdrawing the proposed rules, "state and state association commenters questioned the need for a new regulation in light of states already having the information the EPA was seeking by virtue of existing CAFO programs," and at least some of these states "expressed interest in working with the EPA to exchange that information." 77 Fed. Reg. at 42681.  Gaps will undoubtedly exist, but the EPA has not promised

perfection, and the record provides substantial support for the more limited objective the Agency has decided to pursue at this time.

Unpermitted CAFOs.  All agree that the category of unpermitted CAFOs presents a more difficult challenge for the EPA.  *See* JA 218 (noting that "obtaining similar site-specific information from unpermitted CAFOs will be much harder and may require substantial EPA analysis if a state does not have records for non-discharging CAFOs").  Plaintiffs are thus correct that the record reveals significant obstacles to using existing data sources to compile a comprehensive database with respect to these unpermitted CAFOs.

Nonetheless, the record also shows that the EPA will be able to obtain at least some additional information on unpermitted CAFOs.  During the rulemaking proceeding, the Office of Wastewater Management conducted a review of available data and concluded that it may meet the "agency's information needs" for specific geographical regions, JA 217, and recommended that final action on the CAFO reporting requirement be delayed to allow the EPA to work with states to "move forward with obtaining the information on CAFOs," JA 219.  Moreover, before it took final action on the proposed rules, the EPA was able to obtain and review a number of records on unpermitted CAFOs.  *See* JA 233, 244 (EPA collected 76 CAFO records from 2012, and 106 CAFO records (including duplicates) from 2011 from North Dakota, which has no NPDES permits), JA 229, 244 (EPA obtained 2,790 CAFO records from North Carolina, which has very few NPDES permits, before withdrawing proposed rule).  These datasets have limitations; for instance, the EPA noted that the North Dakota and North Carolina data indicate that "many" of those states' records come from a single CAFO in each state, *see* JA 244, and the EPA does not suggest that every state has information about unpermitted CAFOs.  But, the EPA's decision did not rely on a conclusion that currently existing data would enable it to collect

*all* of the relevant data; instead, the EPA concluded that it could get *much* of the relevant information by leveraging states' "longstanding relationships with owners and operations that confine animals" in order to "facilitate information sharing."  JA 3.

The EPA also considered other sources of information that the states and others may have about unpermitted CAFOs.  Most notably, CAFOs are often subject to state regulations separate from the NPDES program.  For instance, several states impose licensing or similar requirements on poultry farms to regulate the disposal of poultry carcasses.  JA 92.  Similarly, "[e]very state with dairies has a program to enforce" federal health standards, and the responsible state agencies "usually keep lists of licensed or inspected dairies" and "use multiple sources to verify completeness."  JA 93.  As the EPA noted, states thus "maintain direct relationships with CAFO owners and operators." 77 Fed. Reg. at 42682.  Some of these states, moreover, submitted comments indicating that they collect information about CAFOs beyond that covered in the proposed rule.  *See, e.g.*, JA 376 (Delaware); JA 390 (Kentucky).  The EPA has also relied on reports and maps gathered by academic institutions and organizations like Plaintiffs to "identify areas where CAFO information is lacking."  Dkt. 26-1 at 20; *see also* 76 Fed. Reg. at 65447 (discussing report by Plaintiff FWW).  Although Plaintiffs argue that the EPA "conducted a thorough evaluation of all the existing sources of CAFO information" and rejected them before issuing the proposed rule, Dkt. 24-1 at 9, in fact, the EPA simply identified "some of the limitations EPA faces in using" each particular source, and it explicitly sought comment on how those sources could be used to meet the EPA's CWA needs, 76 Fed. Reg. at 65445.

Even more significantly, the EPA recognized that it would face significant hurdles in obtaining information on unpermitted CAFOs under any of the approaches it considered, including the proposed Information Rule.  Plaintiffs estimate that there may be as many as

24,304 CAFOs nationwide; about 18,000 of these are required to have permits, but only about 8,000 actually have permits.  Dkt. 38 at 1.  With respect to the roughly 10,000 CAFOs that are required to obtain NPDES permits but have failed to do so, it is unclear what the proposed Information Rule would add.  They are already required to provide the relevant information to state or federal regulators, but have failed to do so.  And, with respect to those CAFOs that are not subject to the permitting requirement, the EPA's conclusion that unpermitted CAFOs are "less likely to comply" with a reporting requirement "because they are unaware of the requirement or because they do not understand that the requirement applies [to] them," JA 37, is undoubtedly "reasonable."  *Mfcrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012).

Accordingly, with respect to both permitted and unpermitted CAFOs, the evidence in the record is sufficient to allow a reasonable person to reach the conclusions that the EPA did regarding the existing sources of information.

> b.  *Alternative Regulatory Tools*

In withdrawing the proposed rule, the EPA did not conclude that it would be able to obtain the information it sought solely from existing sources.  Instead, it explained that, if necessary, it planned to rely on other regulatory tools at its disposal, "such as site visits and individual information collection requests," or surveys, to supplement available information.  77 Fed. Reg. at 42682.  Plaintiffs question the efficacy of each of these regulatory tools.  In their view, replacing rulemaking with information requests would "not embrace transparency and open government"; site visits would be unduly burdensome; and the EPA's track record demonstrates its inability to "effectively leverage its oversight authority" to require states to gather databases of CAFO information.  Dkt. 31 at 18-19.

Absent a statutory standard, it is not the Court's role to second-guess the Agency's policy judgments about which tools are most likely to work or the burden that they may impose on regulated parties.  *See Nat's Telephone Co-op. Ass'n v. FCC*, 563 F.3d 536, 542 (D.C. Cir. 2009).  Here, the parties do not dispute that the EPA has the statutory authority to gather information using the approaches it has identified.[8]  In certain respects, the law may require transparency; for example, the Paperwork Reduction Act would require the EPA to publish a notice in the Federal Register and solicit public comment before submitting surveys to more than nine facilities.  *See* 44 U.S.C. § 3507(a)(1)(D).  But there is no reason to believe that, if the EPA pursues one of these approaches, it will fail to comply with the relevant requirements.

In addition, the Court declines to consider Plaintiffs' contention that the EPA's lack of practical ability to compel states to provide CAFO information is exemplified by delays in its efforts to obtain CAFO information from Illinois.  *See* Dkt. 31 at 19.  That argument relies on evidence that is not in the record and that post-dates the EPA's final decision in this case.  In the absence of a "strong showing of bad faith or improper behavior," or a record "so bare that it prevents effective judicial review," the Court may not consider extra-record evidence.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010).  Plaintiffs have not made such a showing here.

c. *The "Next Step" Towards a More Complete Solution*

The EPA also premised its decision to withdraw the proposed rules on the ground that collecting and analyzing information from existing sources is a reasonable next step towards a

---

[8]  Although the parties do not dispute the EPA's authority, the American Farm Bureau Federation noted in an amicus brief that "[m]any comments on the Proposed Rule took issue with the EPA's" conclusion that it has authority to collect information from non-discharging CAFOs.  Dkt. 45 at 5.

more complete solution.  The Agency explained that "obtaining CAFO information from existing sources is an important next step to developing a comprehensive inventory and will inform future Agency efforts," JA 36, and it noted that the separate "E-Reporting" rulemaking that was currently underway would "pave the way" for the EPA to develop a comprehensive inventory for at least those CAFOs that are permitted.  *Id.*

Plaintiffs contend that the EPA has not sufficiently articulated how gathering information on CAFOs without the Information Rule is a reasonable first step towards creating a comprehensive database.  Relying on the Court of Appeals' decision in *Center for Biological Diversity*, they assert (Dkt. 31 at 32-33) that the "one-step-at-a-time" doctrine does not permit an agency "'to thumb its nose at Congress and say—without any explanation—that it simply does not intend to achieve a congressional goal on any timetable at all.'"  722 F.3d 401, 410 (D.C. Cir. 2013) (quoting *Grand Canyon Air Tour Coalition*, 154 F.3d 455, 477 (D.C. Cir. 1998).  To invoke the "one-step-at-a-time" doctrine, an agency must "articulate (1) what it believes the statute requires and (2) how it intends to achieve that goal."  *Id.*  As Plaintiffs correctly observe, in *Center for Biological Diversity*, the Court of Appeals concluded that the EPA's reliance on the doctrine temporarily to exempt biogenic carbon dioxide from a rule was arbitrary and capricious because the Agency failed to offer any interpretation of the statute at issue there—the Clean Air Act—that would allow the EPA "to treat biogenic carbon dioxide sources differently."  *Id.* at 410.

Here, however, unlike in *Center for Biological Diversity*, the proposed Information Rule was not issued pursuant to a statutory mandate.  Rather, the EPA proposed to act pursuant to Section 308 of the CWA.  Although that provision provides that the EPA Administrator "shall" require the owners or operators of point sources to provide information needed to "carry out the

objectives of" the CWA, it leaves it to the Administrator to decide what information she "may

reasonably require."  33 U.S.C. § 1318(a)It is true that the EPA is charged with regulating

discharges from CAFOs.  But the proposed Information Rule merely implicated one tool that

Congress provided to the EPA to assist it in fulfilling its broader statutory mandate.  This,

accordingly, is not a case in which the Agency was thus required to identify "what it believes the

statute requires" and "how it intends to achieve that goal."  To the contrary, it is undisputed that

the CWA does not require that the EPA create or maintain the type of database that Plaintiffs

envision.  And, in any event, the Agency did identify its goal and how it intends to achieve it:  It

intends to gather information about CAFOs to "assist in implementation of CWA programs," 77

Fed. Reg. at 42681, and, it intends to achieve that goal by first relying on existing information,

and then, if necessary, considering "what additional information may be needed and the best way

to collect that information," *id.* at 42682.

      d.  *Efficiency and Resource Allocation Concerns*

      Plaintiffs next argue that the EPA's decision to withdraw the Information Rule rested on

the Agency's conclusion that the use of existing sources of information is a "more efficient

approach than requiring information from CAFO operators directly," Dkt. 24-1 at 21, and that

this conclusion is unsupported in the record.  They contend that, contrary to the EPA's

conclusion, reliance on existing information will require the expenditure of "inestimable Agency

resources," along with USDA, state, and ACWA resources, while the proposed Information Rule

would have been "fast and relatively cost-minimal for all parties."  Dkt. 24-1 at 22.

      In withdrawing the Information Rule, the EPA did not state that it viewed its preferred

approach as "more efficient" than the co-proposed options.  It did, however, explain that the

approach it ultimately adopted is an "efficient approach that does not duplicate efforts" and that

it "will minimize the burden on states and CAFOs."  77 Fed. Reg. at 42682.  The EPA further

explained that "without a rule . . . , the Agency can reduce the regulatory burden on states and

CAFOs while obtaining the information in a timely manner,"  JA 38, and it noted that a

"concerted effort to obtain CAFO information minimizes private sector reporting and potentially

duplicative reporting by owners and operators of CAFOs."  JA 36.  In the proposed rulemaking,

moreover, the EPA had explained that effective implementation would require "extensive

outreach to the CAFO industry to ensure that all CAFOs know of the existence of this rule and

any requirement to respond," 76 Fed. Reg. at 65437, and commenters emphasized that such

outreach would be critical, *see, e.g.*, JA 432, 470.

To the extent that Plaintiffs contend that the burden imposed by the Information Rule

would have been relatively minimal, the record indicates that they are at least partially correct.

The EPA, for example, initially estimated that each CAFO would need just one hour to gather

and submit the information requested, JA 22, and it would have required CAFOs to submit the

information only once every ten years, JA 14; *see also* JA 30, 196-97.  The EPA also initially

estimated that the proposed Information Rule would impose "no direct costs to States," because

it left it to the states to decide whether to provide information to the EPA on behalf of CAFOs.

JA 535.

That, however, is only half the picture.  Commenters challenged the EPA's view that the

Information Rule would impose only minimal costs.  They argued that the one-hour estimate

understated the likely burden on CAFOs, and, in particular, on those CAFOs located in rural

areas without access to the internet.  JA 440 ("Many CAFO operators do not regularly use

electronic forms, and many rural communities where CAFOs are located lack high-speed

internet.  Requiring a waiver . . . is burdensome."); *see also, e.g.*, JA 371, 426, 551.  States also

noted that any reporting requirement would result in states having to expend their staff time and resources to answer questions from CAFOs subject to the new regulation (or to submit the information on behalf of CAFOs), rather than on water conservation projects.  *See, e.g.*, JA 353. And, even more significantly, the EPA would have needed to expend substantial resources ensuring that CAFOs, including unpermitted CAFOs, were made aware of the reporting requirement.  *See* 76 Fed. Reg. at 65437; *see also* JA 37-38.

Thus, neither approach is free of substantial burdens—and the EPA itself would incur many of those burdens regardless of whether it conducted a program designed to maximize self-reporting by CAFOs or worked with the states and others to obtain existing information.  In this context, as is usually the case, the "proper allocation of resources to achieve agency priorities" involves the balancing of factors "peculiarly within [the Agency's] expertise."  *Kisser v. Cisneros*, 14 F.3d 615, 620 (D.C. Cir. 1994) (discussing agency non-enforcement decisions); *see also, e.g.*, *Lincoln v. Vigil,* 508 U.S. 182, 193 (1993) (discussing allocation of funds from lump-sum appropriation).  "[C]ost-benefit analyses," moreover, "epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency."  *Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983).  This is because an "agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."  *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991).  The Court, accordingly, concludes that the EPA's determination that reliance on existing sources of information is "efficient" and "will minimize the burden on states and CAFOs" is not "contrary to the evidence before it" or a "clear error in judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

### 3.  *Was The EPA's Decision Contrary To Law?*

Finally, Plaintiffs also contend that the EPA's final decision withdrawing the rulemaking must be set aside under the APA because it "conflicts with its obligations under the CWA," Dkt. 31 at 9, and "fails to adhere to the purpose of the Act," *id.* at 4.  In support of this contention, Plaintiffs principally rely (Dkt. 31 at 11) on *Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1329-30 (D.C. Cir. 1988).[9]  In that case, the EPA had promulgated a proposed rule that would have regulated six hazardous smelter waste sites that were plainly subject to restrictions under a statute.  *Id.* at 1329-30.  Later, however, the EPA withdrew the rule as to those six sites because it needed more time to determine how to address other, "borderline cases"—even though there was no dispute that the six sites were not borderline cases and were clearly subject to the statute.  *Id.*  The Court of Appeals concluded that the Agency's need for more time to deal with borderline cases was no excuse for withdrawing a rule that extended only to clearly covered entities.  *Id.*  From this decision, Plaintiffs draw the conclusion that the reasonableness of the EPA's decision to withdraw the proposed Information Rule must be measured against the Agency's broad statutory mandate under the CWA.

That is more weight than *Environmental Defense Fund v. EPA* can bear.  The decision does not stand for the sweeping proposition that the reasonableness of every decision by an agency to withdraw a proposed rule must be measured against the relevant statutes that the agency enforces.  Here, no statute mandates that the EPA require that all CAFOs self-report, and the statute expressly leaves it to the EPA Administrator to decide what information she "may

---

[9]  In their opposition to the EPA's motion for summary judgment, Plaintiffs argue that the EPA's decision was improperly motivated by political pressure based on a letter from the Chairman of the House Committee on Oversight and Government Reform.  *See* Dkt. 30 at 40 (discussing JA 314-20).  This argument, which focuses on a statement in that letter establishing the Committee's authority to conduct investigations, *see* JA 319, is without basis.

reasonably require." 33 U.S.C. § 1318(a)(A).  To conclude, under these circumstances, that the Agency's decision to withdraw a proposed rule on the ground that it would have better enabled the EPA to perform its statutory mission would unduly encroach on the discretion of the Agency to decide how best to allocate its resources and to perform its assigned functions.  The Court's role "in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one," *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978), and the Court will not substitute its judgment about how the EPA should go about collecting information for the Administrator's reasonable determination of what is appropriate to effectuate the Agency's statutory mandate.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is **GRANTED** and Defendants' Cross-Motion for Summary Judgment is **DENIED**.  A separate order will issue along with this Memorandum Opinion.

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date:  September 29, 2015